## Staunton

### STARKE v. COMMONWEALTH,

November 19, 1914.

Absent, Keith, P.

1. CRIMINAL LAW—*Proof Required for Conviction—Case at Bar—Appeal and Error.*—In order to convict of a criminal offense every fact necessary to a verdict of guilty must be proved beyond a reasonable doubt. The result of the evidence must be to exclude every reasonable hypothesis of innocence, and be consistent only with the guilt of the accused, and if a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, the jury cannot arbitrarily adopt the interpretation which incriminates him. In the case at bar, considered as it must be in this court as on a demurrer to the evidence, the evidence is not sufficient to sustain the verdict of conviction of the accused.

Error to a judgment of the Circuit Court of Brunswick county.

*Reversed.*

The opinion states the case.

*Turnbull & Turnbull,* for the plaintiff in error.

*John Garland Pollard, Attorney-General* and *Christopher B. Garnett, Assistant Attorney-General,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

F. W. Starke was indicted in the Circuit Court of Brunswick county upon a charge of maliciously shoot-

ing with a pistol one Walter Smith, and upon his trial he was found guilty and sentenced to confinement in the penitentiary for one year. To that judgment a writ of error was awarded by this court.

The petition for the writ assigns two errors in the proceedings in the trial court: (1) The ruling of the court refusing to set aside the verdict of the jury for the reason that there was no evidence to support it; and (2) because the verdict found the accused guilty of malicious shooting when there was no evidence to support such finding. In the view that this court takes of the case 't will be necessary to consider only the first assignment of error.

The circumstances attending the shooting of Smith were as follows: Smith, together with one Walter Keeton, F. E. Tew and J. F. Schuh, had on Saturday night, October 18, 1913, been assisting the owner of a show in removing the tents under which there had been an exhibition that day and night, on a vacant lot on Hicks street in the town of Lawrenceville. They left the show grounds a few minutes after twelve o'clock and went out on Hicks street and from there the party proceeded down Hicks street to a stable in rear of J. M. Turnbull's livery stable to relieve, as they state, a call of nature, but also went to the house of a colored woman by the name of Nannie Putney near the livery stable; Tew going to the door of the house of this woman, who he said was his washer-woman, and had a conversation with her. From there the party of young men, seemingly out on a frolic or a "lark," went back up Hicks street to its intersection with Main street, where they were joined by a "Mr." McCutchins, and proceeded down Main street on their way, as they state, to a restaurant to get something to eat, they, about 12:30 o'clock a. m. on October 19, came to the small house situated a few feet from the sidewalk

of Main street occupied then and for some time prior by the prisoner as a barber's shop, and seeing a light from a crack under the deor Schuh started to open the door of the shop, for the purpose, as he said, of getting a shave, but according to Smith's statement, stumped his toe on a plank projecting from a board platform in front of the shop and "fell against the door, knocking a whole glass pane from the same with his elbow, and thereupon called the said F. W. Starke, but no one answered, and they continued on down the street." According to the statement of others in this party who testified in this case, Schuh had gotten hold of the knob on the shop door and in his efforts to open the door, either his shoulder or elbow pushed out the pane of glass. However, the party proceeded to the restaurant, which they found closed, and thereupon, as they claim, Schuh, suggested that they return to the shop of Starke and pay him for the glass. As they started back (quoting from the evidence given by Smith) "upon reaching an alley between the Bank of Lawrenceville and the store of the Lawrenceville Furniture Company, some one opened the door of Starke's said barber shop and came out of the shop. Standing in the light, this person *halloaed*, but witness could not tell what he said, but recognized positively the voice he heard as that of said F. W. Starke, with whom witness was well acquainted. . . At this time the five members of the party as well as witness were walking abreast up the street, back towards the shop . . with Schuh in front . . . They all heard the report of a pistol, and at once saw the flash of the pistol on the sidewalk in front of the shop of the accused and immediately a bullet struck witness, piercing his thigh a few inches above the knee from front to rear, and glancing slightly upwards lodged in the flesh a few inches above the knee." Wit-

ness said some one had shot him, and at the same time
Tew said he also had been shot, indicating a perforation
in his trousers which he attributed to a bullet.  Smith on
cross-examination stated that there were no screen doors
in front of prisoner's barber shop and no lights on the
street except at the lower and upper ends of Main street;
"that the distance from the point where he was shot to
the shop of accused was 137 feet, and that in the gloom
he did not recognize the features of the person who came
out of the shop, but distinctly saw a person come out of
the shop on to the side walk in the light of the open door
of the shop, and he saw the flash of the pistol when this
person fired the weapon and recognized the person by
his voice when he called to the witness and his com-
panions, as the accused."

The physician who attended Smith and took the bul-
let out of his leg a short while after he received the
wound testified in this case, stating that the bullet struck
Smith in front of the leg just above the knee, taking a
slightly upward course, lodging in the flesh about four
inches deep, and exhibiting the bullet to the jury, which
was flattened lengthwise on one side and somewhat
blunted at the end.  The witness further said that the
wound was not very serious and that it healed quickly;
that in order for the bullet to take the course it did, and
present the appearance that it did, it might have
ricocheted from the ground, or the wounded man might
have held his knee higher than is ordinarily done by a
pedestrian, and that the bullet on the flattened side had
evidently struck something hard.

All of the companions of Smith who were with him
when he received this wound have also testified in this
case, except Tew, who it seems swore out the warrant
for the arrest of the prisoner, Starke, and then left Law-
renceville before a hearing on the warrant, so that his

whereabouts were not known at the time of the trial before the justice, or in the circuit court. While Smith had testified positively that the five members of the party, at the time he was shot, were walking abreast up the street, his companion Keeton testifies that Tew and Schuh walked in front and that he (witness) with Smith and McCutchins were about five feet in the rear when he saw the prisoner (Starke) come out of his shop and heard him say, "Some of you damn rascals broke my glass;" that thereupon Schuh replied, "Yes, I will be up there and pay you for it;" that immediately a pistol was fired towards the witness and his companions "by the person whom he took for Starke, who had come out of the barber shop, who was then standing in front of the door of the shop on the sidewalk," but witness "did not recognize the features of this person, owing to the gloom of the night." On cross-examination this witness said positively that he had not been, on the night that Smith was wounded, "to the foot of Hicks street to relieve a call of nature after they left the show grounds," and also stated that not one of the party went to the house of Nannie Putney on this occasion, although others of the party admitted that they had been to the Putney woman's house, and one of them had gone to the door of the house, and had a talk with her.

McCutchins, after telling about the party going to the restaurant and turning back up Main street towards Hicks street and having reached an alley intersecting with the street, says that he "saw F. W. Starke, the accused, come out of his shop some distance from them, and heard him say, 'Some of you damn rascals have broken my glass,' and Schuh said, 'Yes, we will pay you for it;' that immediately he heard a pistol shot and saw a flash at the point in front of the shop of the accused; that Walter Smith immediately said, 'I have been shot,' and Tew declared also 'a bullet has hit me.'"

Schuh testified that "they had proceeded but a little way on their return when before reaching the said barber shop towards which they were making their way, witness heard said Starke call and say 'Some of you white folks done broke my glass,' whereupon witness replied, 'Yes, and I want to pay you for it.' That witness did not recognize the features of Starke, but did hear a pistol shot and saw a flash at a point on the sidewalk in front of the open door of the shop and identified this person by his voice as the accused, with whom he was well acquainted; that Walter Smith at once said, 'Some one has shot me.' "

Not one of the party with Smith at the time he received his wound, nor Smith himself, would testify that the prisoner, Starke, fired the shot that inflicted the wound. All of these parties say that but one shot was fired; while if it be true, as Smith states, that they were walking abreast up the street towards the prisoner's shop when he received the pistol wound described by his attending physician, it is impossible that the one bullet fired from a pistol at a point in front of the barber's shop could have wounded him and also made " a hole in Tew's pants. " More than two reputable citizens of Lawrenceville testify that on the occasion of the wounding of Smith at a late hour of the night—12:30 o'clock a. m. or later—they heard a number of shots fired in immediate succession at or in the vicinity of the occurrence, and it is also testified to by witnesses for the prisoner and without serious contradiction on the part of Smith, or his companions, that just preceding this occurrence they were on the streets of the town creating a disturbance that was annoying to citizens residing in hearing of their conduct. While all of the party deny that they had any firearms with them, and some of them say that they had not been drinking, others admit that

they had been, one of them admitting that he had taken three drinks.

C. I. Mitchell, deputy sheriff and constable of Brunswick county, in whose hands the warrant for the prisoner's arrest was placed, testifying in this case for the prosecution, states that he was on Hicks street in the town of Lawrenceville, just around the corner from Main street, on the night of the shooting, about twelve o'clock; that Smith and his four companions above named passed witness going towards Main street, and that he did not know where they were going or where they went; that in a little while he heard a pistol shot, which appeared to be just at or just around the corner of Main street and Hicks street in front of the store of Peebles & Purdie Co.; that about two hours after a warrant was issued against the prisoner for the shooting and witness arrested him in his barber shop; that the prisoner protested his innocence and stated that he had not fired a pistol, but that he thought one of the boys had shot at him; that he, the prisoner, had not been out of his shop, and that he had no pistol. This witness further testified that he examined the shop of the prisoner but could find no pistol on his person or in his shop; that he also went to the residence of the prisoner a few yards away, making a careful examination of the premises for a pistol, but could find none.

This evidence constitutes the case made by the Commonwealth.

As observed, neither of the witnesses for the prosecution stated that the person who fired the pistol, the flash of which they saw, was the person whom they say came from the prisoner's shop, and whom they could not recognize "because of the gloom," or that the pistol was fired by the person whose voice they took to be that of the prisoner.

There are glaring discrepancies in the stories told by Smith and his companions when testifying in this case for the prosecution; but conceding that these discrepancies do not serve to discredit the evidence given by them, and that there was evidence sufficient to warrant the jury in believing that there was but one pistol shot on the occasion of the wounding of Smith, and that this shot was fired at a point in front of the prisoner's shop, we do not think that the evidence warranted the finding of the jury that the prisoner was the person who fired the pistol.

In the case of *Burton and Conquest* v. *Com'th*, 108 Va. 892, 62 S. E. 376, the circumstances attending the fatal shooting of one Topping, of which Burton and Conquest were found guilty and sentenced to serve a term in the penitentiary, were very similar in many respects to the circumstances in which the shooting of Smith in this case occurred, and the judgment of the circuit court in the first-named case was reversed by this court, the opinion by Keith, P., saying: "In order to justify a conviction, juries are told that every fact necessary to a verdict of guilty must be proved beyond a ressonable doubt and that, if there be a reasonable doubt as to any fact, they shall acquit; that the result of the evidence must be to exclude every reasonable hypothesis of innocence and be consistent only with the guilt of the accused.

"Now, it is true, that after the jury have rendered their verdict and a court is called upon to set it aside as being contrary to the evidence, the motion is heard, under the statute, as upon a demurrer to evidence, and it becomes the duty of the court to consider whether or not the evidence is sufficient to sustain the verdict. But the rule does not leave the jury at liberty to guess, and where a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the ac-

cused, they cannot arbitrarily adopt that interpretation which incriminates him.''

The evidence in this case, as in the case just quoted from, considered in the light of the well settled principles of criminal law, is wholly insufficient, in our judgment, to sustain the verdict of the jury; therefore, the judgment of the circuit court thereon must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial therein to be had, if the circuit court and the attorney for the Commonwealth consider that a better case against the prisoner can be made out.

*Reversed.*